UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| S. D. O., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| | ) No. 1:12-cv-01815-SEB-MJD |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Claimant S.D.O., a minor, by his mother Cheryl M. Oldham, requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. § 1382. For the reasons set forth below, the Magistrate Judge recommends that the matter be **AFFIRMED**.

**I.    Procedural History**

S.D.O. filed an application for SSI on August 26, 2010, alleging onset of disability as of November 8, 2007.[1] S.D.O.'s application was denied initially on November 17, 2010 and denied on reconsideration on February 11, 2011. S.D.O. timely requested a hearing, which was held before Administrative Law Judge Rosanne M. Dummer ("ALJ") by video on November 1, 2011. The Appeals Council denied S.D.O.'s request for review on November 9, 2012, making the ALJ's decision the final decision for purposes of judicial review. S.D.O., by and through his mother, filed his Complaint with this Court on December 13, 2012.

---

[1] A previous application for SSI was filed on S.D.O.'s behalf on November 29, 2007. This request was ultimately denied on August 3, 2010. Although S.D.O. alleges onset of disability as of November 8, 2007, the ALJ considered the relevant period to begin on August 4, 2010, the day after the final prior decision denying SSI.

1

## II.    Factual Background and Medical History[2]

S.D.O., now thirteen years old, was ten years old at the start of the relevant period, beginning on August 4, 2010. By the time he was in third grade, S.D.O. was receiving counseling for poor anger management and symptoms of depression. [R. at 314.] In November of 2009, S.D.O.'s treating physician, Dr. Young, referred S.D.O. to the Hamilton Center, where he was diagnosed with Oppositional Defiant Disorder; Attention-Deficit/Hyperactivity Disorder (ADHD), Predominantly Inattentive Type; Major Depressive Disorder, Single Episode, Mild; and Mixed Receptive-Expressive Language Disorder. [R. at 308, 314.] At the Hamilton Center, S.D.O. received treatment for these impairments from December of 2009 through April of 2011. [R. at 384-433.] At the time of his relevant application for SSI, S.D.O. was taking the following medications: Abilify for his Anger and Depression, Adderall for his ADHD, Albuterol for his Asthma, and Prozac for his Depression. [R. at 195.]

At the Hamilton Center, the goals for S.D.O. included expressing anger appropriately through respectful verbalizations and healthy outlets, improving impulse control through taking his medication as prescribed by a physician, and acknowledging the depression and resolving its causes by expressing feelings in play-therapy sessions. [R. at 401-02.] In September of 2010, S.D.O. still expressed anger toward his sister, though his mother noted a slight improvement in his mood since he began taking Abilify. [R. at 403.] In October of 2010, Hamilton Center reported no progress, poor hygiene, worsened family relations, and disruptive behavior at school. [R. at 409.] In November of 2010, S.D.O. told his therapist that his grades had improved, and he had not acted out against his sister since his last appointment; Dr. Dewell also noted that S.D.O. denied any symptoms of depression. [R. at 414.] S.D.O.'s December 2010 appointment

---

[2] Although extensive medical history dating back to 2007 was submitted, this Report and Recommendation will focus on the relevant evidence, dating from August 4, 2010. *Abendroth v. Barnhart*, 26 F. App'x 580, 584 (7th Cir. 2002) (limiting "the relevant evidence" to the evidence dated after the initial disability denial).

reported stable progress and less severe, less frequent defiance at home. [R. at 416.] The next progress report, from March of 2011, reveals further improvement and notes more stable behavior with less frequent episodes of aggression. [R. at 419.] In April of 2011, S.D.O.'s mother "reported seeing improvement since onset of services at [Hamilton Center]." [R. at 424.]

In a questionnaire from September of 2010, S.D.O.'s mother reported that she had to supervise S.D.O. to make sure that he completed his chores properly and that he became angry with everyone in the house when this didn't go his way, saying "I wish that you were dead" and picking fights with his siblings, throwing things at them, and hitting them. [R. at 200-01.] Also in September of 2010, S.D.O.'s fourth-grade teacher reported no problems in Acquiring and Using Information, no problems in Attending and Completing Tasks, serious problems in expressing anger and respecting authority under Interacting and Relating with others, no problems in Moving About and Manipulating Objects, and no problems in Caring for Himself, noting that S.D.O. "can be rude and talkative" when he forgets to take his medication. [R. at 207-12.]

In November of 2010, S.D.O. underwent an Adaptive Behavior Assessment, which notes that, while "[t]here were no concerns about [S.D.O.'s] cognitive ability," he still had "some difficulty with his ability to understand what he reads and complete math problems"; the school psychologist conducting the assessment also noted that, although S.D.O.'s mother reported adaptive behavior difficulty, such difficulty was not observed at school. [R. at 262.] A different November 2010 assessment, this one conducted by state agency medical consultants, concluded that S.D.O.'s impairments were severe, but did not meet, medically equal, or functionally equal the Listings, and the consultants additionally observed that S.D.O. was "[c]redible, not disabled." [R. at 352, 357.]

3

That same month, November of 2010, S.D.O. was subjected to the Wechsler Intelligence Scale for Children, conducted by Kristen Joyner, B.S., under the supervision of Roger Perry, Ph.D. HSPP. [R. at 348.] The test revealed that S.D.O. was functioning in the mid defective to the mid low average range of intellectual functioning, and he was diagnosed with a GAF of 55. [R. at 350.] Ms. Joyner and Dr. Perry also confirmed S.D.O.'s diagnosed impairments while observing that his medications were keeping him calm and on track, "making some progress in school despite his poor social and behavioral adjustment at his current school." [*Id.*]

In December of 2010, S.D.O.'s Cognitive Ability tested in the low average range, and by January of 2011, S.D.O.'s grades were in the C- to B+ range, his speech therapy was discontinued, and his recommended Special Education consisted of sixty minutes per week. [R. at 260, 267, 271.] A second state agency medical consultant assessment from February of 2011 concluded, again, that S.D.O.'s impairments were severe, but did not meet, medically equal, or functionally equal the Listings, and the consultants additionally observed that the "[complaints] by mother are not fully supported by reports from school." [R. at 378, 383.]

At the hearing on this matter, held in November of 2011, S.D.O., then eleven years old, and his mother both testified. S.D.O. testified that he sometimes got in trouble with his teachers for talking and needed his mother to fix his collar when he got dressed, but that there was nothing that made him feel different from other kids. [R. at 51-52.] During his testimony, S.D.O. further reported playing sports at school and at home with friends, taking care of his dog, playing video games, enjoying music, cooking noodles, and helping with chores. [R. at 49-60.] S.D.O.'s mother testified that S.D.O. "told the truth" during his testimony, adding that, by the tone of his voice, S.D.O. seems to wake up angry and that he sometimes says, out of anger, "I wish I was dead" or "I ought to kill myself." [R. at 61-64.] Additionally, S.D.O.'s mother

4

reported that he made "a lot of Fs and Ds," especially in reading and spelling and that he was oppositional defiant with her when he, instead of completing his chores right away, asked to do them "in a minute." [R. at 65-66.] The ALJ carefully considered these facts. [R. at 68.]

### III. Applicable Standard

For an individual under the age of eighteen to be eligible for SSI, a claimant must have a disability according to 20 C.F.R. § 416.924. The Act defines disability of a child as a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a minor claimant is disabled, the Commissioner employs a three-step sequential analysis: (1) if the claimant has engaged in work that qualifies as substantial gainful activity, she is not disabled regardless of her medical condition, age, education, or work experience; (2) if the claimant does not have a medically determinable, severe impairment or combination of impairments, she is not disabled; and (3) if the claimant does not have an impairment that meets, medially equals, or functionally equals a Listing or does not meet the twelve-month durational requirement, she is not disabled. 20 C.F.R. § 416.924(a), (b). *See also Murphy v. Astrue*, 496 F.3d 630 (7th Cir.2007); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483 (7th Cir.2007).

In considering whether a child's impairment functionally equals a Listing, the ALJ determines whether the claimant has an extreme limitation in one of the following domains or a marked limitation in two of the following domains: (1) Acquiring and using information, (2) Attending and completing tasks, (3) Interacting and relating with others, (4) Moving about and manipulating objects, (5) Caring for yourself, and (6) Health and physical well-being. 20 C.F.R. 416.926a(b), (d). In making such determinations, the ALJ must consider the functional

limitations from all medically determinable impairments, regardless of whether an impairment to be taken into account is severe. 20 C.F.R. 416.926a(a).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001). The standard of substantial evidence is measured by whether "a reasonable mind might accept [the evidence] as adequate to support a conclusion." Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000) (quoting Diaz v. Chater, 55 F.3d 300, 305 (7th Cir. 1995)). This court may not reweigh the evidence or substitute its judgment for that of the ALJ, but may only determine whether or not substantial evidence supports the ALJ's conclusion. Overman v. Astrue, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted," Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993), but the ALJ must consider "all the relevant evidence," Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; he must "build an accurate and logical bridge from the evidence to [his] conclusion." Dixon, 270 F.3d at 1176.

### IV.   The ALJ's Decision

The ALJ followed the three-step child disability analysis and initially found that (1) S.D.O. has not engaged in substantial gainful activity and (2) S.D.O.'s "attention deficit hyperactivity disorder (ADHD); depression; oppositional defiant disorder; learning disorder; borderline intellectual functioning; asthma; and allergies" are "severe" impairments, as the medical and nonmedical evidence shows that the impairments have more than a minimal effect on the claimant's functioning. [R. at 14.] Next, to determine whether S.D.O.'s impairments met or medically equaled a listed impairment, the ALJ considered the evidence under Listing 112.02

for Organic Mental Disorders, Listing 112.04 for Mood Disorders, Listing 112.05D and 112.05E for Mental Retardation, Listing 112.08 for Personality Disorders, and Listing 112.11 for Attention Deficit Hyperactivity Disorder (ADHD). [R. at 15.]

Listing 112.02, Organic Mental Disorders, was not met because there was no evidence of abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain and because there was no evidence of a history of exams or tests that demonstrated or supported the presence of an organic factor related to an abnormal mental state. [*Id.*] Listing 112.04, Mood Disorders, was not met because there was no evidence of a marked impairment in two of the necessary categories. [*Id.*] Listing 112.05D and 112.05E, Mental Retardation, was not met, in part, because there was no evidence of any of the prerequisite deficits in adaptive functioning. [*Id.*] Listing 112.08, Personality Disorders, was not met because there was no evidence of pervasive, inflexible, and maladaptive personality traits. [*Id.*] Finally, Listing 112.11, ADHD, was not met because there was no evidence of a sufficient number of marked impairments in the necessary categories. [R. at 16.] The ALJ concluded that, taking all of the impairments "alone and in combination," the impairments of record did not meet or medically equal a Listing.

The ALJ then considered whether S.D.O.'s impairments functionally equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 by addressing the six domains for measuring a child's functionality. The ALJ first found a less than marked limitation in Acquiring and Using Information, as the consultative examiners indicated a "mid low average range of intellectual functioning" and an I.Q. score of 81, his grades were "decent," and his overall performance was in the low average range. [R. at 22-23.] Second, the ALJ found a less than marked limitation in Attending and Completing Tasks, as S.D.O.'s teacher did not observe

7

problems in this area, Dr. Zirnheld noted that S.D.O. did his homework carefully and turned in his assignments, and the overall record indicated less than moderate limitations in this area. [R. at 23-24.] With regard to the third domain, the ALJ found a less than marked limitation in Interacting and Relating with Others because S.D.O. had slight problems at school in this area that did not impede his learning or the learning of others, he had less frequent episodes of aggression, and Dr. Zirnheld observed that S.D.O. "had a good mood," was not fighting, and was "doing fine." [R. at 24-25.]

The ALJ then found no limitation in the fourth domain, Moving About and Manipulating Objects, because S.D.O. himself testified that he plays sports and video games, his teacher reported no problems observed in this domain, and "the overall record does not indicate any limitation in this domain." [R. at 25.] In Caring for Yourself, the fifth domain, the ALJ found a less than marked limitation because the consultative examiners observed S.D.O.'s ability to conduct his own self-care and to follow directions, and S.D.O. himself testified that, while he sometimes needs help dressing and waking up in the morning, he successfully takes care of his chores. [R. at 26.] Finally, the ALJ found a less than marked limitation in Health and Physical Well-Being, as S.D.O. did not frequently miss school because of illness and his infrequent asthma attacks never resulted in hospitalization. [R. at 27.] Without two domains with marked limitations or one domain with an extreme limitation on his functionality, the ALJ ruled that S.D.O. is not disabled under the Act.

## V.   Discussion

S.D.O. raises three arguments as to why this Court should reverse the decision of the ALJ: (1) the ALJ improperly rejected and ignored evidence that proves disability, (2) the ALJ's failure to seek an updated medical consultation necessitates reversal, and (3) the ALJ's decision

to limit the weight given to the testimony of S.D.O.'s mother in determining functional equivalence contravenes Social Security Ruling 96-7p. The Court now examines these issues.

### A. Substantial evidence supports the ALJ's determination that the claimant was not disabled, as the ALJ properly relied on the relevant medical evidence presented

It is the duty of the ALJ to consider the entirety of the record when making her disability determination; "the ALJ may not simply ignore evidence." *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009). When examining a medical report, the ALJ must examine "the entirety of the mental health assessment" and cannot limit her discussion of a report merely to the portions "that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). With regard to GAF, scores, however, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir.2003)) (holding that the doctor's narrative, finding no significant medical impairments, substantially supported the ALJ's determination of lack of disability, in spite of the low GAF score given).

S.D.O. first argues that the ALJ "arbitrarily rejected the several years of special education and psychiatric treatment and examination evidence," further emphasizing that "the ALJ fail[ed] to consider evidence contrary to the denial decision and fail[ed] to explain the omission." [Dkt. 18 at 16-17.] That is simply not the case. On the very first page of her opinion, the ALJ clearly explains the reason for the omission:

> Previously an application was filed on behalf of the child for supplemental security income benefits on November 29, 2007, which was denied initially, on reconsideration, and by decision of Administrative Law Judge on August 3, 2010. Though the claimant alleges an onset of disability as of November 8, 2007, the undersigned will consider the relevant period beginning August 4, 2010, a day after the prior denial decision.

9

[R. at 11.] Although an ALJ "must consider all the relevant evidence," *res judicata* bars the ALJ from questioning the prior decision denying disability. *Abendroth v. Barnhart*, 26 F. App'x 580, 584 (7th Cir. 2002) (limiting "the relevant evidence" to the evidence dated after the initial disability denial). When there is a prior disability denial, it is the claimant's burden to prove that her condition deteriorated to the point of disability **after** the date of such an initial denial. *Id.* at 583. Therefore, the ALJ properly limited her review of the record to "all the relevant evidence" by only considering the evidence dated after August 4, 2010.

S.D.O. argues that, even limited to the evidence dated after August 4, 2010, the ALJ wrongfully ignored the GAF scores of Dr. Zirnheld, which, S.D.O. claims, indicate disability. [Dkt. 18 at 17-18.] It is true that Dr. Zirnheld diagnosed S.D.O. with GAF assessments of 46 [r. at 364], 50 [r. at 366], and 50 [r. at 369] during the relevant time period, which indicate "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. 2000). However, after acknowledging S.D.O.'s GAF score of 50, the ALJ discussed S.D.O.'s most recent session with Dr. Zirnheld in detail, calling attention to the doctor's notes indicating improvements in S.D.O.'s condition, including his improved mood, his good grades, his fair judgment, his improved behavior, and his average intelligence. [R. at 19 (citing r. at 425).]

In limiting the review to the relevant evidence, substantial evidence supports the ALJ's finding of no disability. While the ALJ did not, in writing, track every detail submitted to the record, such an intricate written decision is not required. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). What is evident, however, is that the ALJ took into consideration not only S.D.O.'s GAF scores, but also Dr. Zirnheld's written observations in order to determine whether

10

S.D.O.'s condition has worsened since August 4, 2010, as required by *Campbell* and *Denton*. So long as the ALJ takes into account the entirety of the practitioner's evaluation in making her disability determination, *Denton* emphasizes that GAF scores are not dispositive of a claimant's functionality by any means. Because "a reasonable mind might accept" the evidence presented as sufficient to sustain the ALJ's finding, *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000), substantial evidence supports the conclusion the S.D.O. does not qualify for SSI disability.

> **B.  The ALJ's failure to summon a medical adviser to testify whether the claimant's combined impairments medically equaled a Listing after further evidence was added to the record does not require reversal**

In determining whether the claimant's impairments medically equal a Listing, "[a]n ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Although the ALJ has a duty "to develop the claimant's complete medical history," the ALJ does *not* have a duty "to update objective medical evidence to the time of the hearing." *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994) (quotations omitted). Where the medical evidence presented does not indicate the need for an updated medical examination, the ALJ is under no duty to order a consultative examination. *See Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991). It is instead "the claimant who bears the responsibility of providing medical evidence of an impairment." *Id.* at 348 (citing 20 C.F.R. § 404.1504, 404.1508).

S.D.O. claims that the ALJ was duty bound to obtain an updated opinion from a medical advisor, specifically a psychologist, to consider evidence acquired after February of 2011, the most recent agency medical consultant review. [Dkt. 18 at 19.] Social Security Ruling 96-6p dictates that an ALJ is only required to obtain an updated medical expert opinion if one of the following two situations occurs: (1) no additional medical evidence is received, but the ALJ's

11

opinion suggests that a judgment of equivalence may be reasonable or (2) additional medical evidence is received that, in the ALJ's opinion, may change the medical consultant's original finding that the claimant's impairment does not medically equal a Listing. In this instance, additional medical evidence was received after the State agency consultants submitted their opinions, so the latter situation must be examined.

Here, S.D.O. argues that his impairments medically equal "any Listed impairment, such as 12.04 [sic]" and that the ALJ's failure to summon a medical advisor after new evidence was submitted "requires reversal." [Dkt. 18 at 19.] As *Howell* indicates, it is S.D.O.'s burden to prove that his symptoms meet or medically equal a Listing. While it is undeniable that new evidence was submitted after the most recent agency medical consultant reviewed the record, the new evidence must, "in the ALJ's opinion," give rise to the possibility that the conclusion(s) of the original agency medical review(s) might change. SSR 96-6p. To support his claim, S.D.O., instead of evaluating the new evidence in any detail, merely writes: "Presumably if they had reviewed all of the evidence they would have reasonably determined the claimant was totally disabled." [Dkt. 18 at 19.] Without even indicating which Listing is presumably met, not to mention failing to illustrate how the new evidence weighs in favor of a finding of disability, S.D.O. has not met his burden of proof.[3]

Even if S.D.O. had argued the merits of the evidence, however, his argument would fail. S.D.O. specifically notes that the agency medical consultants "did not review the 3-24-11 and 4-19-11 psychiatric treatment (R. 420, 425) or the 9-30-11 Midtown mental health psychiatric assessment 9R. 439)." [Dkt. 18 at 19.] The March 24, 2011 evaluation of S.D.O.'s mental status notes that he was alert, cooperative, irritable, logical, not focused, had no suicidal or homicidal

---

[3] In fact, such a "skeletal 'argument,' really nothing more than an assertion, does not preserve a claim" and constitutes a waiver of this issue. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

ideation, and displayed fair judgment and insight with average intelligence; Dr. Zirnheld personally observed that S.D.O. was not fighting with his brother or friends, played well, and was doing well in school, though he was easily distracted, got mad for about twenty minutes every day, and his mother said that he looked "pitiful." [R. at 420.] The April 19, 2011 evaluation makes the same observations, except that S.D.O.'s mood had improved from irritable to good, and Dr. Zirnheld observed that S.D.O. was no longer mad every day and was not in trouble at school, though he would still lose his belongings occasionally and get easily sidetracked. [R. at 425.] These updated Hamilton Center records seem to track an improvement in S.D.O.'s condition, not a deterioration.

The September 30, 2011 evaluation from the Midtown Community Mental Health Center notes that S.D.O. still met the criteria of his prior diagnoses, as he had difficulty following through on directions, he had low self-esteem and was often sad, and he would shut down when angry; Dr. Tanksley personally observed that S.D.O. was well groomed and coordinated, had a depressed mood, displayed good eye contact, was oriented, had relevant thoughts, and displayed no barriers to concentration or judgment. [R. at 439.] Not one of these three documents gives the Court pause to question the ALJ's judgment in electing to proceed without an updated opinion from an agency medical consultant. The new evidence maintains the same diagnoses as the evidence the agency medical advisers took into account and, if anything, observes positive changes in S.D.O.'s efforts to cope with his impairments. Accordingly, the ALJ did not err in failing to seek an updated medical opinion after the new evidence was submitted.

S.D.O. also argues that the ALJ "cited no evidence regarding medical equivalence to a Listing," asserting that the ALJ thereby wrongfully relied upon her own lay opinion in reaching her conclusion. [Dkt. 18 at 20.] This is a mischaracterization of the ALJ's decision. When

13

evaluating the requirements of the various Listings alleged, the ALJ focused not on the evidence that was presented, but on the essential evidence that was **not** presented, emphasizing in at least seven circumstances that essential Listing qualifications were not met. [R. at 15-16.] Consequently, the fact that the ALJ did not cite evidence does not mean that the ALJ substituted her lay opinion; the paucity merely evidences that S.D.O. did not meet his burden of proof. In addition, the ALJ later includes a comprehensive analysis of the opinions of the agency medical consultants, all of whom opined that S.D.O.'s combined impairments do not meet or medically equal a Listing. [R. at 19-20.] To ignore this analysis would be to promote form over substance, to which this Court with not succumb. In her opinion, the ALJ cited to evidence regarding the medical equivalence of S.D.O.'s impairments to Listing requirements, and any void in the opinion was due to S.D.O.'s failure to provide the ALJ with evidence sufficient to make a finding in his favor.

        **C.**      **The ALJ's credibility determination was not patently erroneous.**

After an ALJ determines that a minor claimant's combined impairments neither meet nor medically equal a Listing, the ALJ must determine whether the claimant's impairments *functionally* equal a Listing by evaluating the developmental domains: (1) Acquiring and using information, (2) Attending and completing tasks, (3) Interacting and relating with others, (4) Moving about and manipulating objects, (5) Caring for yourself, and (6) Health and physical well-being. 20 C.F.R. 416.926a(b), (d). In evaluating the child's functioning, the ALJ takes into account the "whole child," measured by the child's activities as performed "at home, at school, and in the community." S.S.R. 09-1p. With no requirement to consult with medical experts at this stage, it is the ALJ who determines functional equivalence, based on the evidence presented. *Id.* Additionally, so long as the ALJ gives "specific reasons" for her credibility findings, the

ALJ's measure of the credibility of the witnesses is given great deference; only a "patently wrong" determination will be overturned  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

S.D.O. argues that the ALJ's credibility determination contravenes Social Security Ruling 96-7p, and his mother's testimony regarding his functionality was improperly discredited. [Dkt. 21 at 12-14.]  However, the ruling discusses an individual's credibility with regard to "the evaluation of symptoms" and defines symptoms as "an individual's **own description of his or her** physical or mental impairment(s)."  S.S.R. 96-7p (emphasis added).  In other words, the Ruling, on its face, appears only to apply to the relative credibility of the claimant himself, not of his mother—especially since he was eleven years old at the time of his hearing and was able to, and in fact did, testify on his own behalf.  Accordingly, S.D.O. should not rely solely on Social Security Ruling 96-7p in an attempt to reverse the ALJ's determination that "the [mother's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that . . . [t]he evidence does not indicate disabling impairments."  [R. at 20.]

However, in the event that the ALJ should be required to give specific reasons for a finding on the credibility of a parent under S.S.R. 96-7p in a child disability case, the ALJ has met such a requirement.  In evaluating S.D.O.'s functioning, the ALJ received evidence and testimony regarding S.D.O.'s activity both at home and at school, pursuant to S.S.R. 09-1p.  For such testimony, the ALJ relied on reports from S.D.O. himself, his mother, his teacher, and other school officials.  [R. at 16-27.]

In her analysis, the ALJ first discussed, at length, S.D.O.'s own testimony, noting that S.D.O. liked all of his classes, did not feel that he was different from other children, played sports with his friends, had okay grades, sometimes needed help waking up in the morning,

15

sometimes got in trouble at school for talking, got ready in the morning by himself, could do some cooking, and completed his chores on his own. [R. at 17.] The ALJ then reviewed the testimony of S.D.O.'s mother, who reported that S.D.O.'s grades "could be better," he received counseling for his impairments, he was on several medications, he had problems with his teacher, he had been in special education for three years and received help in reading and math, he did not fight with his friends, he lost things, he had difficulty focusing, was angry every day, and started fights with her. [*Id*.] The ALJ also noted that, while there were no detentions or suspensions on S.D.O.'s record for the 2009-2010 school year, S.D.O.'s mother received phone calls from school officials reporting poor behavior. [R. at 18.] Additionally, the ALJ relied on an October 2010 report from S.D.O.'s fourth grade teacher indicating only "a slight problem" to "no problem" in various categories of childhood function. [R. at 20.]

In explaining her credibility decision to give less credibility to S.D.O.'s mother than to the report of his fourth grade teacher and S.D.O.'s medical reports, the ALJ wrote:

> The overall record indicates that no clinicians or teachers have noted any alarming problems or overt concerns. To the claimant's mother's credit, he does not demonstrate any worsening of his conditions and has shown improvement. [S.D.O.'s mother's] responses to the claimant's representative's questions at the hearing do not indicate debilitating problems. She indicated that the child is in special education and has been receiving help for a while. It appears the special education is a resource room for sixty minutes of extra help a week in reading and math, otherwise he is in the regular classroom with 28 to 1 student to teacher ratio, to his credit.

[R. at 20.] This explanation and reasoning is precisely the kind of reasoning required by S.S.R. 96-7p. Because only a "patently wrong" credibility determination will be overturned, the Court defers to the ALJ's decision. Accordingly, substantial evidence supports the ALJ's functionality determination, and the Court should **affirm** the ALJ's decision denying S.D.O. social security income under the Act.

## VI.  Conclusion

For the aforementioned reasons, the Court should find that substantial evidence supports the ALJ's determination that S.D.O. is not disabled.  The Commissioner's decision should therefore be **AFFIRMED**.  Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 11/26/2013

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov